IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE

## PROFESSIONAL ENGINEERING SERVICES, INC. v. CITY OF RED BOILING SPRINGS, TENNESSEE

**Direct Appeal from the Chancery Court for Macon County**
**No. 2557; The Honorable C. K. Smith, Judge**

—————————

**No. M1999-00342-COA-R3-CV - Decided April 26, 2000**

—————————

This appeal involves a dispute over whether a contract to provide services was formed between defendant-city and plaintiff-engineers and if so, whether defendant-city breached the contract. The court below held that a contract was formed between the parties and granted plaintiff-engineers recovery under the contract. In the alternative, the trial court held that plaintiff-engineers would be entitled to recover in quantum meruit in the absence of a valid contract. Defendant-city appeals.

**Tenn. R. App. P. 3; Appeal as of right; Judgment of the Chancery Court Reversed in Part and Affirmed in Part**

HIGHERS, J., delivered the opinion of the court, in which CRAWFORD, P.J., W.S., and FARMER, J., joined.

Jacky O. Bellar, BELLAR & BELLAR, Carthage, Tennessee for Appellant

A. Russell Brown, Lafayette, Tennessee for Appellee

### OPINION

City of Red Boiling Springs ("City") appeals the trial court's holding that City breached its contract with Professional Engineering Services ("PES"). City also appeals the trial court's alternative holding that PES was entitled to recovery under quantum meruit. For the following reasons, the decision of the trial court is affirmed in part and reversed in part.

### Facts and Procedural History

This appeal arises from a suit filed by PES against City for breach of contract. PES alleged that City contracted with PES to do both preliminary preparations and design work for a new water treatment facility, and that City later breached that contract. In the alternative, if the contract was found unenforceable, PES sought recovery in quantum meruit. City claimed that no contract existed with PES because of PES's failure to gain the required approval of the contract by the city attorney and city council. The trial court found in favor of PES, holding that City had contracted with PES and subsequently breached that contract. The court further found that in the event this court found

no contract existed, that PES was entitled to recovery in quantum meruit. City appeals based on the following facts.

In March 1992, City received a letter from the Tennessee Department of Environment and Conservation ("TDEC") indicating that surface water had contaminated the City water system. The City was instructed to hire an engineer to determine a feasible solution for the problem and to submit the engineer's study within ninety days. In addition, the City was given an October 1, 1993, deadline for construction of a filtration treatment system or other redevelopment of the groundwater source. Failure to comply with the letter's instructions would violate TDEC regulations and could result in fines.

The city council voted for local engineer Ronnie Reece (PES) to do the required study.[1] This was memorialized in an "Engineering Agreement" signed by Mayor Tommy Spivey, providing for PES to prepare the study, assist in application for grant or loan assistance, and if approved, to provide various other services and documents. The Engineering Agreement also specified PES's compensation based upon the construction cost of the project. This agreement was signed on April 28, 1992. PES kept one copy of the contract in its files and delivered two copies of the contract to the City.

PES prepared the study as was requested, and forwarded it to the City for approval. The study included estimates for the construction of a water treatment plant, an engineering design fee, and an inspection fee, as well as a recommendation regarding funding. After approval by the City, PES sent the study to the TDEC. The TDEC approved PES's study and recommendations on September 28, 1992.

At a city council meeting in October, PES reported the TDEC's approval to the council and made funding recommendations which were approved by the City. The council voted for PES to proceed with the plans on the water filtration plant. PES did so, picking a site for the proposed facility, locating needed equipment, and performing other preparatory work.[2] In addition, PES appeared before the city council each month to provide an update on the design status of the project.

In December 1992, the City approved PES's proposal to apply for a loan from the Tennessee Association of Utility Districts (TAUD) for funding of the filtration plant. In January 1993, the City learned that its loan application had been approved. In April, the City authorized the Mayor to apply for an additional loan/grant. This loan/grant application contained a signed "Agreement For Engineering Services" providing that PES was to perform the engineering services for the project.

---

[1]Ronnie Reece and Ricky White were partners in Professional Services Group Ltd, a company that was at that time working on another job for the City. The first agreement at issue was between Professional Services Group and the City. Professional Services Group was incorporated as Professional Engineering Services prior to the second agreement at issue in this lawsuit. For the sake of clarity, the party will be referred to as PES throughout this opinion.

[2]During this period, Ricky White took over the primary functions of the job, acting as design engineer and overseeing the drafting and writing of the project specifications.

In June, the City decided to apply for a Community Development Block Grant (CDBG) for additional funding. As required by the CDBG, the City advertised for an engineer and administrator for the project. PES prepared and submitted the CDBG application for the City. In July 1993, the council discussed the hiring of engineers for the project. At this time, it was noted that PES had a contract authorizing it to proceed with the design of the project. The council also discussed a bill for $46,088.92 that it had received from PES. The council passed a motion to hire PES as engineer for the city CDBG water filtration project.

In August 1993, the council discussed payment of PES's invoice and the validity of the contract between the City and PES. The council voted that the contract was not valid and advised PES to work with the City attorney to prepare a new contract and proceed with the project.

In October 1993, the City passed a resolution requiring PES to produce a preliminary engineering report for the project. The resolution stated that pending approval of the CDBG, PES would be engaged to design plans, inspect construction, and perform other required project services. Later that month, the CDBG grant was approved.

In November 1993, the council hired Water Management Services to study the feasibility of alternatives to the construction of a new water treatment facility. In April 1994, PES explained the difference between the conventional water treatment plant and a pressure filter plant. A motion was made and passed by the council to have a conventional water treatment plant installed. On May 12, 1994, the council voted to employ Water Management Services as engineers to install a water pressure filter system. The new water treatment plant was built on the site previously chosen by PES.

On August 3, 1994, PES filed suit against the City for breach of contract. PES alleged that both the Engineering Agreement of April 1992 and the Agreement for Engineering Services of April 1993 were contracts for PES's services. In addition, PES alleged that it was never paid for its work and that it was not allowed to complete the project. According to PES, the designs were eighty-five percent complete at the time the City breached the contract. In the alternative, PES sought to recover for quantum meruit.

In its answer and a subsequent motion for summary judgment, the City alleged that PES failed to state any claim because no contract had been formed. The City alleged that all contracts had to be approved by the city council and city attorney to be valid. The court denied the City's motion for summary judgment.

At trial, PES presented evidence indicating the formation of a contract with the City. This evidence included testimony by both engineers who worked on the project as well as the various written agreements between PES and the City. In response, the City offered testimony regarding the correct procedure for contracting with the City. This procedure required approval of the contract by both the city attorney and city council. The court found in favor of PES and awarded damages for breach of contract in the amount of $56,488 plus pre-judgment interest. The court also found that if the contracts were held invalid by the appellate court, that PES could recover $123,277 on the

basis of quantum meruit.  The City appeals.

On appeal, the City asserts that the trial court erred in holding the PES is entitled to recover for breach of contract.  City asserts that the contracts were not valid and that therefore, City cannot be liable for breach.  In addition, City asserts that the trial court erred in finding that PES was entitled to recover in quantum meruit if the contracts were found invalid by this court. Finally, City asserts that PES lacked capacity to bring the suit based on its change from a partnership to a corporation.

**Analysis**

As a preliminary matter, we find it necessary to address City's argument that PES lacks capacity to bring this suit.  Regardless of any alleged problem as to capacity that may have existed when this suit was initiated, the issue has not been properly raised or preserved by the City. According to Rule 9.01 of the Tennessee Rules of Civil Procedure, an objection to the existence or capacity of any party must be addressed by specific negative averment of the challenging party.[3] Failure to follow this procedure results in the waiver of the objection.  Kemmons Wilson V. Allied Bank of Texas, 836 S.W.2d 104 (Tenn. Ct. App. 1992) (stating that failure to make a specific negative averment as to a party's authority to sue waives the objection); see also TENN. R. CIV. P. 12.08.[4]   For the reasons stated above, we find it unnecessary to address this issue further.  We now turn to the City's remaining issues.

**A. Breach of Contract**

On appeal, the City argues that the agreements entered into between PES and the City were not valid contracts.  City alleges that these agreements are void or voidable as *ultra vires*, because they were not properly authorized by the city council or approved by the city attorney.  In support of this contention, the City points to the relevant provisions in the city charter, which outline the proper procedure for contracting with the City.

Municipalities may exercise only those express or necessarily implied powers delegated to them by the Legislature in their charters or under statutes.  City of Lebanon v. Baird, 756 S.W.2d 236, at 241 (Tenn. 1988) citing Barnes v. City of Dayton, 216 Tenn. 400, 410, 392 S.W.2d 813, 817

---

[3] TENN. R. CIV. P. 9.01 provides: "It is not necessary to aver the capacity of a party to sue or be sued or the authority of a party to sue or be sued in a representative capacity or the legal existence of an organized association of persons that is made a party. *When a party desires to raise an issue as to the legal existence of any party or the capacity of any party to sue or be sued or the authority of a party to sue or to be sued in a representative capacity, he or she shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge.*" (emphasis added)

[4] TENN. R. CIV. P. 12.08 provides in relevant part: "A party waives all defenses and objections which the party does not present either by motion as hereinabove provided, or, if the party has made no motion, in the party's answer or reply, or any amendments thereto...The objection or defense, if made at the trial, shall be disposed of as provided in Rule 15 in the light of any evidence that may have been received."

-4-

(1965); <u>Adams v. Memphis & Little Rock R.R. Co.</u>, 42 Tenn. 645, 654 (1866). "[T]he provisions of the charter are mandatory, and must be obeyed by the city and its agents...." <u>Barnes v. Ingram</u>, 217 Tenn. 363, 373, 397 S.W.2d 821, 825 (1965). When a municipality fails to act within its charter or under applicable statutory authority, the action is *ultra vires* and void or voidable. <u>Crocker v. Town of Manchester</u>, 178 Tenn. 67, 70, 156 S.W.2d 383, 384 (1941).

A municipality's action can be *ultra vires* because the action was outside the city's authority under its charter or statute, or because the action taken was not consistent with the charter or statute's mandatory provisions. <u>City of Lebanon v. Baird</u>, 756 S.W.2d 236, at 241 (Tenn. 1988) Accordingly, the law distinguishes between the existence of a municipal power and the manner or mode of exercising municipal power legitimately. See <u>City of Chattanooga v. Tennessee Electric Power Co.</u>, 172 Tenn. 524, 112 S.W.2d 385 (1938) (existence of power); <u>Rutherford v. City of Nashville</u>, 168 Tenn. 499, 79 S.W.2d 581 (1935) (manner of exercise).

At issue here is whether the City acted consistently with its charter regarding the agreements with PES. According to the charter, the city council has the power to "authorize the expenditure of money for any municipal purpose," and to "provide for the acquisition, construction, building, operation, and maintenance of ...any...public improvements, inside or outside the City." In addition, the mayor shall sign contracts only "when authorized by the Council to do so..." Finally, the contracts must be approved by the city attorney.

From our reading of the record, the agreements between PES and the City were not made according to the procedures outlined in the charter. PES obtained the mayor's signature on the first agreement without obtaining the express approval of either the city council or city attorney. Although PES did make this agreement available to the City, and therefore to the council and city attorney, there is no evidence that formal approval was given. In addition, the second agreement fails to reflect the requirements outlined by the city charter. Therefore, for the reasons stated above, the agreements between PES and the City were *ultra vires*. The trial court erred in holding that the agreements were enforceable contracts.

### B. Quantum Meruit

Before turning to the actual quantum meruit analysis, we must address another argument City asserts as a bar to equitable relief. City asserts a governmental immunity argument based on Tenn. Code Ann. § 9-8-107.[5] According to City, this provision limits any recovery against a municipality

---

[5]Tenn. Code Ann. § 9-8-307 provides in relevant part:

(a)(1) The commission or each commissioner sitting individually has exclusive jurisdiction to determine all monetary claims against the state based on the acts or omissions of "state employees," as such term is defined in § 8-42-101(3), falling within one (1) or more of the following categories:

(L) Actions for breach of a written contract between the claimant and the state which was executed by one (1) or more state officers or employees with authority to execute the contract; provided, that the group insurance agreements created pursuant to §§ 8-27-201 and 8-27-302 shall be considered contracts for purposes of this subsection in order for the commission to determine insurance claims which have been previously rejected by the state insurance committee or the local education insurance committee;

to actual damages based on an express written contract, and therefore PES cannot be awarded an equitable remedy. The statute cited by City is not applicable to this case. Section 9-8-107 refers to the jurisdiction of the Tennessee Board of Claims, which deals exclusively with claims against the state and state employees, not municipalities. See also Tenn. Code Ann. § 8-42-101(3)[6] (providing

---

(d) The state will be liable for actual damages only. No award shall be made unless the facts found by the commission would entitle the claimant to a judgment in an action at law if the state had been a private individual. The state will not be liable for punitive damages and the costs of litigation other than court costs. The state will not be liable for willful, malicious, or criminal acts by state employees, or for acts on the part of state employees done for personal gain. The state may assert any and all defenses, including common law defenses, which would have been available to the officer or employee in an action against such an individual based upon the same occurrence. The state may assert any absolute common law immunities available to the officer or employee, however, good faith common law immunity may not be asserted. If the claimant is successful with any claim filed with the claims commission after January 1, 1985, the state shall pay such interest as the commissioner may determine to be proper, not exceeding the legal rate as provided in § 47-14-121. In contract actions, interest may be awarded, but if the rate of interest is provided in the contract, the award of interest shall be at that rate.

[6] Tenn. Code Ann. § 8-42-101(3) provides:
(A) "State employee" means any person who is a state official, including members of the general assembly and legislative officials elected by the general assembly, or any person who is employed in the service of and whose compensation is payable by the state, or any person who is employed by the state whose compensation is paid in whole or in part from federal funds, but does not include any person employed on a contractual or percentage basis. "State employee" includes a foster parent under a contract with the state of Tennessee to provide foster home care for children in the care and custody of the state and within the confines of the foster parent-child relationship. Notwithstanding any statute to the contrary, for the purposes of provision of legal representation, "state employee" also includes employees of community service agencies, and for purposes of §§ 9-8-112 and 9-8-307, including, but not limited to, § 9-8-307(a)(1)(k), "state employee" also includes employees of community service agencies. "State employee" also includes a contract security employee working with the department of children's services, solely to the extent that such contract security employee shall be permitted to drive a state vehicle pursuant to the rules and regulations of the department of general services, division of motor vehicle management, if such contract security employee's duties include the transportation of juveniles and, such contract security employee shall not be considered a state employee for any other purpose;
(B) "State employee" also includes any person designated by a department or agency head as a participant in a volunteer program authorized by the department or agency head. "State employee" also includes community service agency volunteers designated by the commissioner of the department of health; provided, that designated volunteers who are medical professionals providing direct health care pursuant to title 378, chapter 5, part 3 shall be considered state employees solely for the category of "professional malpractice" pursuant to § 9-8-307. Volunteers shall not be eligible for workers' compensation benefits from the state. It is the duty of each agency and department to register with the board of claims the names of all persons participating in a volunteer program authorized by such department or agency head. If an agency or department head fails to register the name of a volunteer with the board of claims, any amounts paid by the state pursuant to this chapter or title 9, chapter 8 as a result of the volunteer's actions shall be funded through the agency's or department's budget. The commissioner of finance and administration is authorized to promulgate rules and regulations to determine who is qualified to be designated as a volunteer. Such rules and regulations may set forth the criteria for qualification of participants in volunteer programs. All such rules and regulations shall be promulgated in accordance with the provisions of the Uniform Administrative Procedures Act, compiled in title 4, chapter 5;

(C) "State employee" under this chapter and under title 9, chapter 8, also includes, as a volunteer, a person designated by the district attorney general of each judicial district as a member of a judicial district task force relating to the investigation and prosecution of drug cases. The district attorney general of each judicial district shall register only

applicable definition of state employees).

The trial court held that, if the agreements were found unenforceable, PES was entitled to recovery on the basis of quantum meruit. On appeal, the City argues that PES is not entitled to recovery pursuant to quantum meruit because PES did not confer a benefit on the City. For the following reasons, we find that the trial court was correct in holding that PES could recover quantum meruit damages.

An action in quantum meruit provides an equitable substitute for contract claims. Such an action allows parties who have provided goods and services to another to recover the reasonable value of these goods and services. In order to recover under quantum meruit, the following factors must be established: (1) there must be no existing, enforceable contract between the parties covering the same subject matter; (2) the party seeking recovery must prove that it provided valuable goods and services; (3) the party to be charged must have received the goods and services; (4) the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and (5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them. Castelli v. Lien, 910 S.W.2d 420, at 427 (Tenn. Ct. App. 1995).

PES has met all of the factors required to recover for quantum meruit. As we previously stated, there is no enforceable contract between PES and the City because the agreements were *ultra vires*. PES supplied and the City received a valuable service, by virtue of both PES's preparation of the preliminary report, the loan, and grant applications, and by selecting the site that was ultimately used to build the water treatment facility. Both the testimony of PES engineers and the minutes from the city council meetings indicate that the City understood that PES expected to be paid for its services. At two of the council meetings, PES's bill for services was discussed. Finally,

---

the names of properly qualified and designated task force members with the board of claims. Any member of such a task force designated by the district attorney general shall meet the criteria for qualifying as such a member as set forth in rules and regulations promulgated by the commissioner of finance and administration. The commissioner, after consultation with the department of safety and the Tennessee bureau of investigation, is authorized to promulgate rules and regulations to determine who shall qualify to be designated as a member of such judicial district task forces. Such rules and regulations may set criteria for qualifications of members and may set limits on the numbers of task force members from each district who may be registered. All such rules and regulations shall be promulgated in accordance with the provisions of the Uniform Administrative Procedures Act, compiled in title 4, chapter 5. Task force members are not eligible for workers' compensation benefits from the state of Tennessee; and

(D) "State employee" also includes persons who are both members of community-based screening agencies that function under title 33, chapter 2, part 6 and who screen individuals to make judgments required by title 33, chapter 2, part 6. "State employee" further includes the department of mental health and mental retardation's "medical consultant"; this individual shall be a licensed physician who is designated by the commissioner of mental health and mental retardation to provide medical consultation and advisory services to and on behalf of the commissioner and to the department of mental health and mental retardation under title 33. The commissioner shall register only the names of properly qualified and designated persons with the board of claims. Persons designated under this item are not eligible for workers' compensation benefits from the state of Tennessee.

it would be unjust for the City benefit from the services provided by PES without providing compensation. Accordingly, the trial court did not err in holding that PES is entitled to recover in quantum meruit.

## Conclusion

For the foregoing reasons, the trial court's finding of breach of contract is hereby reversed, and the trial court's finding of recovery in quantum meruit is affirmed. Costs of appeal are taxed to the Appellant, City, for which execution may issue, if necessary.